Filed 7/24/13  P. v. Gerrue CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C071020 |
| Plaintiff and Respondent, | (Super. Ct. No. CM032537) |
| v. | |
| WARREN ALLEN GERRUE, | |
| Defendant and Appellant. | |

In an ordeal lasting four days, defendant Warren Allen Gerrue imprisoned and severely beat his girlfriend, M.  A jury found defendant guilty of torture, false imprisonment by violence, criminal threats, and corporal injury upon a cohabitant with great bodily injury.  The court sentenced him to an indeterminate term of seven years to life plus a determinate term of four years.

On appeal, defendant raises nine issues relating to the evidence, instructions, and sentence.  Agreeing with one -- the trial court erred in failing to stay the punishment for corporal injury in light of his punishment for torture -- we modify the sentence and affirm the judgment as modified.

1

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

Defendant and M. had been in an on-and-off-again relationship since October 2008. While the two were dating, M. also had a sexual relationship with another man. Sometime after Valentine's Day 2010, M. told defendant she had cheated on him. Defendant said he was "going to treat [her] like crap for a couple months." On a number of occasions after that conversation, he choked and suffocated her. Once, he threw her off the bed onto the ground, and the side of her face hit the tile floor, causing injuries. When defendant's friend saw the bruises on M.'s face, M. told the friend M. had punched herself.

On the afternoon of Friday, May 21, 2010, the abuse in the charged case began. Defendant told M. he was having some friends over and asked her to remain with her son in her son's bedroom. M. complied. Some time later, defendant came into her son's room and lay down on the bunk bed with M. M. asked, " 'What, is there some girl in my bed?' " Defendant responded, " 'No. Shut the hell up.' " But M. "wouldn't really shut up," so defendant "climbed on top of [her] and he pushed his thumbs into [her] eyeballs . . . . [I]t really hurt." He also put his hands over her nose and mouth, suffocating her.

Later that afternoon, when M. disobeyed defendant's order not to get up from a couch where she was watching television with her son, defendant grabbed her by the hair and threw her in her son's bedroom. He then asked her if she had been cheating on him the week before when she said she had been visiting a girlfriend. She kept saying "no," and defendant kept slapping her. In an effort to stop the abuse, M. lied and said she recently had cheated on defendant. Defendant said, " 'You stupid fucking bitch,' " and handcuffed her to the bunk bed. He then choked her with an extension cord until she thought she passed out. He also gagged her with a sock and put some duct tape around

2

her head and then left the room. He came back a while later and "whipp[ed] [her] over and over on the back with [the extension cord], asking [her] questions the whole time about [her lover]." After he "calmed down a little bit," defendant allowed M. outside to smoke a cigarette, but he said he would stab anybody who came over if she ran away. After she came back inside, defendant again handcuffed M. to the bunk bed. As night fell, defendant caught M. trying to escape through her son's bedroom window, so he reapplied the handcuffs much tighter.

The next day, Saturday, May 22, 2010, defendant took off the handcuffs so M. could use the bathroom. He then made her eat a hairball. He allowed her to take a shower but would not let her get dressed when she finished. He told her he was going to the hardware store to buy six buckets "to chop [her] into little pieces and put . . . [her] and [her son] in the buckets." By this time, M.'s face was extremely swollen, she had a big black eye, and her entire body hurt badly. When M. heard a car horn, defendant announced his ride was here. He handcuffed M. to the bed and left. M. unsuccessfully screamed for help.

When defendant returned, he took off M.'s handcuffs and let her sit on the couch. But he started whipping her over and over again on her back and kicking her over and over again on her face. Because she "couldn't stand it anymore," she curled up in a fetal position, so defendant repeatedly hit her in the legs.

That night, they slept together because defendant said "he would never do this again, that his dad used to hit his mom, and that he wasn't going to hurt [her] anymore." Defendant did not keep his promise, though, and he stood up on the bed, braced himself with his hands on the ceiling, and kicked her repeatedly, while he asked her questions about her lover. M. ended up with a big bruise on her right hip.

On Sunday, May 23, 2010, defendant came into M.'s son's bedroom, where defendant had again handcuffed M. to the bed. He told M., "there's just no way to get to you. I can't get to you. What am I going to have to do? I think I'm going to have to hurt

3

[your son] to get to you.'"  He took a plastic bag and his "beating stick" to where M.'s son had been sleeping and said, "Hey, [M.'s son], do you want to get in this plastic bag?"  M. "heard the bag rustling around" and was "so scared" she urinated on the floor.  When it was time to go to bed, defendant stood over her with his "beating stick" and told her that if she fell asleep, she "was going to wake up to [her] face being bashed in."  She fell asleep anyway while defendant was questioning her about her lover.

On Monday, May 24, 2010, M. made her escape.  While defendant was asleep, M. got up, got dressed, and ran out of the house.  She banged on the door of a neighbor and then a friend.  They both called police.  M. went to the hospital.  She had extensive bruising all over her body.  She had to relearn to walk, but her balance is still off.  She cannot write well anymore.  She has serious damage to her eyes.

Forensic pathologist Thomas Resk reviewed pictures of M.'s injuries and concluded they were recent because the skin was still shiny and swollen and was yellow and bluish in color.  They were not self-inflicted because of the horizontal direction in which force marks appeared on M.'s body, and the lack of indicia in her nail beds that she had scraped or abraded herself.  Many of the injuries were likely inflicted at a time M. was restrained because of the presence of restraint marks on her wrists and the lack of defensive wounds.

At the time of trial, M. was staying in a drug treatment rehabilitation program that was paid for by the district attorney's office.  The office was paying for her to be in the drug treatment program "[b]ecause they want[ed] [her] to get clean."  The office knew she "wanted to go to rehab" but that she "didn't have any money."

B

*The Defense*

The defense was that M.'s wounds were self-inflicted.

Defendant presented evidence he was doing landscaping work at a house from 3:30 p.m. to 5:30 p.m. on May 21, 2010.  He also presented evidence that M.

4

intentionally cut and scarred herself on her arms when she was 12 years old, had purposefully "throw[n] herself into the washer and dryer" "when she g[o]t[] frustrated with [defendant]," and had told defendant's friend that she (M.) had actually punched herself in the past, causing bruising.

## DISCUSSION

### I

*The Trial Court Was Correct In Not Giving*

*A Unanimity Instruction Regarding Torture*

Defendant contends the trial court erred in failing to give a sua sponte instruction on unanimity for the great bodily injury element of torture.[1]  He claims there were four separate incidents defendant perpetrated that could have caused the great bodily injury element required for a torture conviction:   (1) putting his thumbs into M.'s eyeballs; (2) strangling her with an extension cord; (3) whipping her back with the cord; and (4) kicking and whipping her, bruising her right hip.  We disagree that a unanimity instruction was required because the case was charged and tried as a course of conduct crime.

In *People v. Hamlin* (2009) 170 Cal.App.4th 1412, this court held that a defendant may commit torture by way of a course of conduct, rather than through a discrete act. (*Id.* at p. 1429 ["Just as child, spousal, and animal abuse can be committed by a course of conduct rather than a single act, so can torture"].)  We applied this holding in considering a defendant's claim that "the jury had to find not only that he acted with the intent to cause extreme pain, but that the action he undertook with that intent was one that in fact caused great bodily injury." (*Id*. at p. 1431.)  In rejecting this argument, we reasoned:

---

[1]     The jury was instructed that the great bodily injury element for torture was "the defendant inflicted great bodily injury on someone else" and defined it as "significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm."

"Defendant's argument presumes that each act of violence he committed on [the victim] must be analyzed separately to determine if there was evidence that particular act was committed with the intent to cause severe pain *and* evidence that particular act resulted in great bodily injury. This is incorrect. Where, as here, torture is charged and tried as a course of conduct crime, such analysis is unnecessary. The question for the jury was not whether [the victim] suffered great bodily injury from a particular act defendant committed on a particular day with the intent to cause her severe pain. Rather, the question was whether, with that intent, defendant engaged in a course of conduct toward [the victim] that resulted in great bodily injury. As long as the jury could reasonably find that defendant had the requisite intent when he engaged in the course of conduct, and that the course of conduct resulted in great bodily injury, then the evidence is sufficient to support a torture conviction." (*Ibid*.)

As in *Hamlin*, the record here demonstrates the crime of torture was charged and tried as a course of conduct crime. The complaint charged defendant with torture "[o]n or about and between May 21, 2010, and May 24, 2010." And the People so argued to the jury, specifically noting that defendant whipped, kicked and punched her "all over her body for a four-day period." Thus, the People's election to proceed on a continuous course of conduct theory obviated the need for a unanimity instruction. (*People v. Jennings* (2010) 50 Cal.4th 616, 627, 680 [relying on *Hamlin* to hold that the trial court was not required to give a unanimity instruction for a torture special circumstance finding where the prosecutor proceeded on a " 'course of conduct' " theory].)

## II

### *The Trial Court Was Correct In Not Giving A Unanimity Instruction*
### *Regarding Inflicting Corporal Injury Upon A Cohabitant*

In an argument he describes as "parallel[]" to his first, defendant contends the trial court erred in failing to give a sua sponte instruction on unanimity for the traumatic

6

injury element of inflicting corporal injury upon a cohabitant.**2**  Given defendant's argument, our analysis is parallel to our first as well.

The record here demonstrates the crime of inflicting corporal injury was charged and tried as a course of conduct crime.  The complaint charged defendant with corporal injury to a cohabitant "[o]n or about and between May 21, 2010, and May 24, 2010." And the People so argued to the jury, noting that the evidence of injury for the corporal injury count was the same as the great bodily injury.  Thus, the People's election to proceed on a continuous course of conduct theory obviated the need for a unanimity instruction.  (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 680.)

III

*The Court Was Within Its Discretion To Deny The Defense Motion For Mistrial Premised On Prosecutorial Misconduct; Defendant's Contentions Regarding His Motions For Continuance Or Recusal Of The District Attorney's Office Were Abandoned By His Failure To Press The Court For A Ruling*

Defendant contends the trial court abused its discretion in denying his mistrial motion, continuance motion, and recusal motion that were premised on evidence that the People had paid for M.'s stay in a drug rehabilitation program during trial.

A

*Factual Background*

Before jury selection had ended, the People informed defense counsel they had paid for M.'s stay in a rehabilitation facility for a week before trial.  The payment was for room and board and one week's worth of meals.  Defense counsel moved for a mistrial,

---

**2**      The jury was instructed that defendant had to "willfully inflict[] a physical injury on his cohabitant" that "resulted in a traumatic condition."  "A 'traumatic condition' is a wound or other bodily injury, whether minor or serious, caused by the direct application of physical force."

7

recusal of the district attorney's office from the case, or a continuance of trial. Defense counsel specifically noted he was "not going to levy that accusation of this prosecutor or his office have made their payment of rehab contingent upon any sort of content in [M.'s] testimony." Instead, defense counsel's position was that the "mere act" of paying for M.'s rehabilitation would cause M. "to feel a sense of obligation for those who are paying for her treatment."

The court denied the motion for mistrial because it was reasonable for the People to house M. "in a facility that is more likely to ensure the production of the complaining witness . . . instead of leaving a drug-addicted person in a hotel room unattended on the eve of trial." "Those actions by the district attorney, having been disclosed timely, then subject the witness to proper cross-examination. That examination and the jury instruction on the issue . . . then leaves [defendant] in a position of receiving a fair trial." The court did not address either the continuance or recusal motions.

During direct examination of M., the People elicited from M. that she was staying "in rehab" that was paid for by the "DA." During cross-examination, defense counsel elicited from M. that the district attorney's office was paying for her to be in the drug treatment program "[b]ecause they want[ed] [her] to get clean." The office knew that she "wanted to go to rehab" but that she "didn't have any money."

B

*Defendant's Contentions Regarding The Continuance And Recusal Were Abandoned;*
*The Court Was Within Its Discretion To Deny The Mistrial Motion*

Defendant contends the trial court abused its discretion by denying the motion for mistrial or the alternative motions for continuance or recusal.

We begin by addressing the motions for continuance or recusal. It is a "long-established rule that where a court, through inadvertence or neglect, neither rules nor reserves its ruling, the party who objected or made the motion must make an effort to have the court actually rule, and that when the point is not pressed and is forgotten the

8

party will be deemed to have waived or abandoned the point and may not raise the issue on appeal." (*People v. Brewer* (2000) 81 Cal.App.4th 442, 461.)   Here, defendant never pressed the trial court to rule on his motions for continuance or recusal, and the court never ruled on them.   "Defendant is thus precluded from obtaining appellate review of these issues." (*Id*. at p. 462.)

Defendant's contention regarding his motion for mistrial fares no better.  His argument is that "the prosecutor created a motivation for [M.] to testify in conformity with the prosecution's case."  He continues that "[a] payment like this undoubtedly falls within the prohibition against use of deceptive or reprehensible methods to persuade a jury."  He bases his argument, as he did in the trial court, on what he claims was a violation of legal ethics, specifically, State Bar Rules of Professional Conduct, rule 5-310(B) which states, "A member shall not:  [¶] . . .  (B) Directly or indirectly pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case."  Defendant argues "[a] mistrial should have been granted to disapprove of this violation of legal ethics."

The court did not abuse its discretion in denying the mistrial motion because there was no evidence the prosecutor's payment of M.'s drug rehabilitation was "contingent upon the content of the witness's testimony or the outcome of the case."   (Rules of Prof. Conduct, rule 5-310(B); see also *People v. Silva* (2001) 25 Cal.4th 345, 372 [standard of review for mistrial motions].)  Defense counsel stated, "I am not going to levy that accusation of this prosecutor or his office hav[ing] made their payment of rehab contingent upon any sort of content in [M.'s] testimony."  As such, there was no violation of the rules of professional conduct, and thus, defendant's argument lacks merit.

## IV

*Defendant Has Forfeited His Appellate Contention Regarding The Admissibility Of Evidence That M. Gave Her Grandfather A Marijuana-Laced Cookie*

Defendant contends the trial court erred in excluding evidence that M. had given her grandfather a marijuana-laced cookie because M. "had a reason to exaggerate and alter her testimony, as a means of avoiding prosecution on the new allegation." Defendant has forfeited this contention by failing to raise this theory in the trial court.

In the trial court, defense counsel told the court the prosecutor told him M. was being investigated for giving her grandfather a marijuana-laced cookie and the conduct could amount to elder abuse. Defense counsel argued the evidence was "potentially Brady[3] material" and was "relevant towards impeachment of [M.] as a witness." The prosecutor responded, "this is not something that the DA's office is pursuing in any way, shape, or form." There was not enough evidence to pursue the case and "Brady does not require disclosure of rumors, theories, or mere speculations." Later, defense counsel argued M. "has potentially a crime of moral turpitude that she's being investigated for . . . I think it's a relevant area of inquiry." When the court asked, "[i]n what way would the conduct bear on the credibility of [M.]," defense counsel responded, "Well, [M.], according to the [police] report, [M.] leaves rehab with a bag of pot cookies and gives one to her grandfather. She is a known drug user. She's an admitted user of marijuana. [¶] For her to indicate that she doesn't know that the cookies have marijuana in them is highly suspect in that she's a marijuana user. I highly doubt that she was unaware of that conduct. I think it absolutely goes to her credibility."[4]

---

**3**     *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215].

**4**     The court noted the police report did not state M. was interviewed. "The statement attributed to her comes through another party."

Now on appeal, defendant has switched theories of admissibility, claiming the evidence was relevant because M. "had a reason to exaggerate and alter her testimony, as a means of avoiding prosecution on the new allegation." Nowhere has defendant pointed us to where he argued this theory of admissibility in the trial court, and our review of the record demonstrates he did not make such an argument. Where a defendant does not raise a specific theory of admissibility at the trial court, "he may not do so for the first time on appeal." (*People v. Smithey* (1999) 20 Cal.4th 936, 995.) Defendant has therefore forfeited this contention of admissibility on appeal.

V

*The Trial Court Properly Refused To Instruct On The Lesser Included Offense Of Battery On A Cohabitant Because The Evidence Did Not Support The Instruction*

Defendant contends the court erred in refusing his request to instruct on battery on a cohabitant as a lesser included offense to corporal injury on a cohabitant. Defendant's theory for the lesser is that the jury could have found M. inflicted the most serious corporal injuries herself, while at the same time finding defendant handcuffed her against her will, which would have been sufficient for a battery conviction but not enough for the traumatic condition necessary for corporal injury. The problem with this theory is there was no evidence to support it. (See *People v. Breverman* (1998) 19 Cal.4th 142, 162 ["a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support"].)

While M. testified she had intentionally cut and scarred herself on her arms when she was 12 years old, had purposefully "throw[n] herself into the washer and dryer" "when she g[o]t[] frustrated with [defendant]," and had told a friend of defendant's that she (M.) had actually punched herself in the past, causing bruising, there was no evidence the wounds inflicted *in this case* (as opposed to ones that were inflicted in the past) came from M. The uncontradicted evidence from the forensic pathologist was the wounds

11

were recent because the skin was still shiny and swollen and was yellow and bluish in color; they were not self-inflicted because of the horizontal direction in which force marks appeared on M.'s body, the lack of indicia in M.'s nail beds that she had scraped or abraded herself; and they were likely inflicted at a time M. was restrained because her wrists had restraint marks and there were no defensive wounds.  M. also consistently testified that the wounds in this case were inflicted by defendant.  On this record, there was no evidentiary support for the lesser included offense of battery on a cohabitant.

VI

*There Was No Prejudice In The Court's Omission*

*Of One Sentence In The Written Jury Instructions*

Defendant contends the court gave to the jury an incomplete *written* version of CALCRIM No. 105 regarding evaluating witness testimony.  The written version given to the jury omitted the following from the list the factors the jury may consider in evaluating a witness's testimony:  "Did other evidence prove or disprove any fact about which a witness testified?"

We find any error in omitting this factor from the written instructions harmless.  The portion of CALCRIM No. 105 that the trial court omitted from the written instructions is bracketed in the CALCRIM jury instruction book, meaning it is optional.  In any event, the court *read* to the jury the complete version of CALCRIM No. 105 that included this factor.[5]  At no time was the jury instructed that the written instructions

---

[5]     CALCRIM No. 105 as read to the jury stated:

"You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  [¶]  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part, or none of any witness's testimony.  [¶]  Consider the testimony of each witness and decide how much of it you believe.  In evaluating a witness's testimony, you may consider anything that reasonably

12

controlled over the ones read by the court. Defendant's prejudice argument is a nonstarter because his attempt at demonstrating prejudice is based on "other cumulative errors" that he alleged in his third and fourth arguments (which we have already rejected) that he claims "improperly obscured the weaknesses in [M.]'s testimony." In any event, it is inconceivable that the omission of this one phrase in the written instructions could have prejudiced defendant. This phrase did little more than direct the jury to use its

tends to prove or disprove the truth or accuracy of that testimony. [¶] Among the factors that you may consider are:

"How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

" How well was the witness able to remember and describe what happened?

" What was the witness's behavior while testifying?

"Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

" How reasonable is the testimony when you consider all the other evidence in the case?

"*Did other evidence prove or disprove any fact about which the witness testified?*

"Has the witness been convicted of a felony?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. [¶] People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently." (Italics added.)

13

common sense in evaluating witness testimony, i.e., telling it to consider whether other evidence proved or disproved a witness's testimony. This instruction was not integral to evaluate witness testimony when the jury had just been told to use its "common sense and experience" "[i]n deciding whether testimony is true and accurate." Therefore, any error in omitting this one line from the written instructions was harmless.

## VII

### *The Court Did Not Err In Imposing Separate Punishments*
### *For Torture, False Imprisonment, And Criminal Threats*

Defendant contends his punishment for false imprisonment and for criminal threats must be stayed because he had the same intent for those crimes and for torture. We disagree.

Pursuant to Penal Code section 654 (hereafter section 654), where a defendant has multiple criminal objectives, independent of and not merely incidental to each other, multiple punishments may be imposed. (*People v. Beamon* (1973) 8 Cal.3d 625, 637.) However, " '[i]f all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid*.) We review a challenge under section 654 for substantial evidence to support the trial court's determination -- here that section 654 did not preclude multiple punishments. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

As to the false imprisonment, there was substantial evidence that the objective for that crime was different from the objective of torture. Based on its torture verdict, the jury found, "when inflicting the injury . . . the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." By contrast, as to the false imprisonment conviction, the evidence showed defendant's objective was to prevent M. from escaping to report defendant's violent conduct. Defendant said he would stab anybody who came over if she ran away. When he caught her trying to escape through her son's bedroom window, he reapplied

14

the handcuffs much tighter.  This evidence supported the conclusion defendant harbored separate (albeit simultaneous) objectives to both torture her and prevent her from escaping to report the crimes.

As to the criminal threats counts, there was substantial evidence the objective for that crime was different from the objective for torture.  Defendant threatened to hurt M.'s son to "get to [her]."  Specifically, defendant took a plastic bag and his "beating stick" to where M.'s son had been sleeping and said, "Hey, [M.'s son], do you want to get in this plastic bag?"  Before doing so, he told M, "there's just no way to get to you.  I can't get to you.  What am I going to have to do?  I think I'm going to have to hurt [M.'s son] to get to you.'"  This act of threatened "gratuitous violence" was not " 'incidental' " to torture for purposes of section 654.  (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190.) The court therefore did not err in imposing separate punishments for criminal threats, false imprisonment, and torture.

## VIII

### *The Court Erred In Failing To Stay Defendant's*
### *Punishment For Corporal Injury Upon A Cohabitant*

Defendant contends and the People agree the trial court should have stayed his punishment for corporal injury upon a cohabitant.  So do we.   The trial court specifically found that "[i]n light of the princip[le] under [section] 654," defendant's conduct in inflicting corporal injury was "part of the course of conduct for the conviction[] supporting [the torture count]."  The court then erroneously ordered the punishment for inflicting corporal injury to run concurrently to the punishment for torture instead of staying the punishment.  Yet, the abstract of judgment reflects the punishment for inflicting corporal injury upon a cohabitant was stayed.  We therefore need not order the abstract of judgment amended.

15

## DISPOSITION

Defendant's sentence is modified to stay the punishment for defendant's 2010 commission of corporal injury upon a cohabitant.   As modified, the judgment is affirmed.


                                              ROBIE     , J.


We concur:


      HULL       , Acting P. J.


      DUARTE     , J.